b
**LAW OFFICE OF STEWART KATZ**
STEWART KATZ, SBN 127425
555 University Avenue, Suite 270
Sacramento, California 95825
Telephone: (916) 444-5678

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Estate of  MARK ANTHONY SCOTT, et al., | **CASE NO. 2:13-cv-00024 GEB KJN** |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO COUNTY DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT/ SUMMARY ADJUDICATION** |
| vs. | |
| COUNTY OF SACRAMENTO, et al., | |
| Defendants. | |
| _____/ | Date:   December 22, 2104<br>Time:  9:00 a.m.<br>Ctrm:  10<br>Trial:  Date: June 16, 2015 |

Defendants County of Sacramento, Scott Jones, Roseanne Richael, James Lewis, Aron Brewer, Robert Padilla, M.D., Pamela Harris, George McLeel, James Tidwell, David Pantoja, Ken Becker, Michael Matranga, Michael Xiong and Scott Hufford have moved for partial summary judgment/ summary adjudication. Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-260, Plaintiffs hereby submit this Memorandum of Points and Authorities in Opposition to the motion. Plaintiff's Opposition is based on this Memorandum, Plaintiff's Response and Opposition to Defendants' Undisputed Material Facts (hereinafter "SUMF"), Plaintiff's Separate Statement of Disputing Facts and Supporting Evidence in Opposition to Defendants' Motion for Summary Judgment (hereinafter "SSDF"), the Declaration of Stewart Katz, the attached exhibits, the pleadings

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

1

1   and documents on file herein, and any oral argument that may be made at the hearing of this

2   motion.

3   Dated:  December 8, 2014                                    /s/ Stewart Katz_____

4                                                                            STEWART KATZ,
                                                                             Attorney for Plaintiffs

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE
COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

**INTRODUCTION**……………………………………………………..……….**8**

**LAW AND ARGUMENT** ……………………………………………..……...**8**

**RESPONSE TO DEFENDANT'S LEGAL ARGUMENTS**…………………………...**9**

   **I.  OBJECTIONS TO EVIDENCE (DR. ARENSON'S OPINION(S) CITED IN FACT 26 AND RIVERA DECLARATION EXHIBIT 24)**………………….....**9**

   **II. SCOTT'S MEDICAL NEED WAS, OBJECTIVELY, SUFFICIENTLY SERIOUS**…………………………………………………………….**12**

   **III. CAUSATION IS SATISFIED FOR ANY THEORY OF LIABILITY ADDRESSED IN THIS OPPOSITION**………………………………..…..**12**

   **IV. PLAINTIFFS HAVE PUT FORTH SUFFICIENT EVIDENCE FOR A JURY TO FIND THAT DEFENDANT'S TIDWELL, BECKER, PANTOJA AND MATRANGA WERE, SUBJECTIVELY, DELIBERATELY INDIFFERENT**……………………………………………………..**13**

         A.  Timeline of Events: Tidwell and Becker………………………………**13**

         B.  Timeline of Events: Pantoja and Matranga…………………...……………**18**

         C.  Objective Evidence Confirming Scott's Condition…………………………**19**

         D.  Tidwell's Admission at the Redline Assembly……………………………**20**

         E.  Argument…………………………………………………………**21**

   **V. PLAINTIFFS HAVE PUT FORTH SUFFICIENT EVIDENCE FOR A JURY TO FIND DEFENDANTS BREWER, RICHAEL AND THE COUNTY OF SACRAMENTO LIABLE ON A SUPERVISORY THEORY OF LIABILITY**…………………………………………………………**21**

         A.  Defendant Brewer……………………………..…..…………………………..**23**

         B.  Defendant Richael……………………………..…..…………………………..**25**

   **VI.  PLAINTIFFS HAVE PUT FORTH SUFFICIENT EVIDENCE FOR A JURY TO FIND DEFENDANT COUNTY OF SACRAMENTO LIABLE BASED ON ITS POLICIES AND PROCEDURES FOR INMATE ACCESS TO MEDICAL CARE**……………………………………………………**28**

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

3

A. The deficiencies in the County's policies for inmate access to emergent medical care, as well as the need to remedy them, were so obvious that the County's failure to do so constitutes deliberate indifference..................29

B. The County's policies were the moving force behind the violation...........32

C. The County can be held liable for a constitutional violation caused by its deficient policy even if no individual defendant is held liable in this case....33

**VII.  A JURY SHOULD DECIDE THE FAILURE TO SUMMON MEDICAL CARE STATE LAW CLAIM..............................................................34**

**CONCLUSION..............................................................................35**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

# TABLE OF AUTHORITIES

## CASES

*Carnell v. Grimm,* 74 F.3d 977 (9th Cir. 1996)

*Chew v. Gates,* 27 F.3d 1432 (9th Cir. 1994)

*Christie v. Iopa* 176 F.3d 1231 (9th Cir. 1999)

*City of Canton v. Harris,* 489 U.S. 378 (1989)

*Claar v. Burlington N. R.R. Co.,* 29 F.3d 499 (9th Cir. 1994)

*Clarke v. Schofield,* 632 F.Supp. 2d 1250 (M.D. Georgia 2009)

*Clouthier v. County of Contra Costa,* 591 F.3d 1232 (9th Cir. 2010)

*Cunningham v. Gates,* 229 F.3d 1271 (9th Cir. 2000)

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)

*Daubert v. Merrell Dow Pharms, Inc.,* 43 F.3d 1311 (9th Cir. 1995)

*Dominguez v. Corr. Med. Servs.,* 555 F.3d 543 (6th Cir. 2009)

*Davis v. Mason County,* 927 F.2d 1473 (9th Cir.), cert denied, 112 S.Ct. 275 (1991)

*Dorger v. City of Napa,* No. 12-cv-440 YGR, 2012 WL 3791447 (N.D. Cal. Aug. 31, 2012)

*Elsayed Mukhtar v. California State University,* 299 F.3d 1053 (9th Cir. 2002)

*Estate of Abdollahi vs. County of Sacramento*, 405 F. Supp. 2d 1194 (E.D. Cal. 2005)

*Estelle v. Gamble,* 429 U.S. 97 (1976)

*Fairley v. Luman,* 281 F.3d 913 (9th Cir. 2002)

*Farmer v. Brennan,* 511 U.S. 825 (1994)

*Figueroa v. Simplicity Plan de Puerto Rico,* 267 F.Supp.2d 161 (D. P.R., 2003)

*Frost v. Agnos,* 152 F.3d 1124 (9th Cir. 1998)

*Gibson v. County of Washoe,* 290 F.3d 1175 (9th Cir. 2002)

*Hayes v. Synder,* 546 F.3d 516 (7th Cir. 2008)

*Henricksen v. Conoco Phillips Co.,* 605 F.Supp.2d 1142 (E.D. Wash. 2009)

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

5

*Henry v. County of Shasta,* 132 F.3d 512 (9th Cir. 1997)

*Hopkins v. Andaya,* 958 F.2d 881 (9th Cir. 1992)

*Johnson v. County of Los Angeles*, 143 Cal. 3d 298 (1983)

*Johnson v. Duffy,* 588 F.2d 740 (9th Cir. 1978)

*Kodimer v. County of San Diego*, No. 07-cv-2221-BEN (NLS), 2010 U.S. Dist. LEXIS 65090 (S.D. Cal. June 30, 2010)

*Larez v. City of Los Angeles,* 946 F.2d 630 (9th Cir. 1991)

*Lay v. Finander*, No. CV 11-04357 ODW (RZ), 2012 U.S. Dist. LEXIS 177665 (C.D. Cal. Nov. 6, 2012)

*LeMarbe v. Wisneski,* 266 F.3d 429 (6th Cir. 2001)

*Lolli v. County of Orange,* 351 F.3d 410 (9th Cir. 2003)

*Lytle v. Carl,* 382 F.3d 978 (9th Cir. 2004).

*Malott v. Placer County,* No. 2:14-cv-1040 KJM EFB, 2014 U.S. Dist. LEXIS 161070 (E.D. Cal. Nov. 14, 2014)

*McGuckin v. Smith,* 974 F.2d 1050 (9th Cir. 1991)

*Menotti v. City of Seattle,* 409 F.3d 1113 (9th Cir. 2005)

*Oviatt v. Pearce,* 954 F.2d 1470 (9th Cir, 1992)

*Owen v. City of Independence,* 445 U.S. 622 (1980)

*Redman v. Warden of San Diego,* 942 F.2d 1435 (9th Cir. 1991)

*Sherrod v. Lingle,* 223 F.3d 605 (7th Cir. 2000)

*Starr v. Baca,* 652 F.3d 1202 (9th Cir. 2011)

*Thompson v. Los Angeles,* 885 F.2d 1444 (9th Cir. 1989)

*United States v. Brien,* 59 F.3d 274 (1st Cir. 1995)

*United States v. Rahm,* 993 F.2d 1405 (9th Cir. 1993)

*United States v. Rincon,* 28 F.3d 921, 924 (9th Cir. 1994)

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

*Zeitman v. County of Kern*, 168 Cal. 3d 1174 (1985)

**JURY INSTRUCTIONS**

Ninth Circuit Model Civil Jury Instructions 9.3

Ninth Circuit Model Civil Jury Instruction 9.6

**RULES**

Federal Rules of Evidence 401, 402, 403, 702, 703

**STATUTES**

California Government Code section 845.6

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Mark Scott was a pre-trial detainee being held at the Sacramento County Main Jail. On Friday, January 6, 2012, he died as a result of untreated vomiting which resulted in unchecked bleeding from esophogal tears.

Scott was sick and vomiting, coughing and spitting up blood from the morning of January 6, 2012 until his death late that evening. Numerous pleas for medical help by and for him went unheeded. Deputies Tidwell, Becker, Matranga and Pantoja received and refused to act upon these requests while ignoring numerous and obvious signs of Scott's severe physical distress, including his vomiting/spitting up blood, the blood spatters in his cell and his deteriorating appearance.

These failures were a predictable result of a constitutionally deficient policy for healthcare access for inmates as well as the supervisory ratification of the deputies' actions and acquiescence to the pitiful inaction of a nurse. Defendants are also liable for a state law claim for failure to summon emergent medical care.

## LAW AND ARGUMENT

As a pre-trial detainee, Mr. Scott's rights under the Due Process Clause of the Fourteenth Amendment while in Sacramento County Jail were at least as great as those rights afforded to prisoners under the Eighth Amendment. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) ("[T]he due process clause imposes, at a minimum, the same duty the Eighth Amendment imposes: 'persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs.'" (quoting *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir.1996)); *see also Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1242 ("[W]e have noted that the Eighth Amendment may provide "a minimum standard of care" for determining the rights of pretrial detainees…." (internal citations omitted).)

A claim for deliberate indifference under the Fourteenth Amendment lies where a defendant acted with "deliberate indifference" to a substantial risk of serious harm. *Frost v.*

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

*Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998); *see also Estelle v. Gamble*, 429 U.S. 97, 105 (1976). A claim of deliberate indifference claim for inadequate medical treatment lies where the plaintiff had a serious medical need and the defendant acted with deliberate indifference to that serious medical need. *Estelle*, 429 U.S. at 105.

Deliberate indifference exists when an official both "knows of and disregards an excessive risk to inmate health or safety." *Gibson v. County of Washoe*, 290 F.3d at 1188 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). If a person is aware that a substantial risk of serious harm exists and neglects a prisoner's serious medical needs, that person can be liable on the basis of either action or inaction. *Gibson*, 290 F.3d at 1188, citing *Farmer*, 511 U.S. at 842.

Deliberate indifference can be manifested by non-medical prison officials in denying or delaying access to medical care. *Estelle*, 429 U.S. at 104. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. *Farmer*, 511 U.S. at 842.

## RESPONSE TO DEFENDANTS' LEGAL ARGUMENTS

### I. OBJECTIONS TO EVIDENCE

In their motion defendants have cited the declaration of Dr. Arenson, whom they have retained as an expert and who is a board certified physician in both internal medicine and gastroenterology. However, Plaintiffs object to several of Arenson's proffered opinions on the basis of Federal Rules of Evidence 401, 402 403, 702, and 703. Arenson's unsupported opinions should not be considered by this Court in deciding the motion for summary judgment/adjudication.

All of the proposed evidence based on Dr. Arenson's opinions is contained within SUMF 25. Rather than expounding upon matters within his expertise, Dr. Arensen instead seeks to simply be allowed to speculate as to what he thinks correctional officers would have known and what he thinks Scott would have probably said and written in his attempts to seek medical help. To the extent Arenson does offer an opinion of a medical nature, his opinion invades the purview of a pathologist and is outside of his own expertise.

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

1   Dr. Arenson attempts to qualify his opinions in the foundational sense as well as in a

2   limiting sense by stating that they are "based upon the records provided to me," without

3   identifying those records. Thus the opinion does not state its basis as required. Given the

4   obvious difference between a conventional medical opinion and what is contained in this

5   SUMF, this is not merely a technical objection. Any expert's opinion pursuant to FRE 702

6   must include the basis for that opinion.

7   Dr. Arenson has no qualifications which permit him to reliably give the medical

8   opinion that "it is improbable that a patient seeking medical attention would fail to note that

9   there was blood in the vomitus if indeed that had been the case prior to completing the

10   document (medical kite)." This opinion is spectacularly speculative and wholly beyond a

11   medical opinion. Apart from the speculation concerning Scott's deliberative processes and

12   cognitive skills, Arenson has indicated no familiarity with the document that he is entirely

13   drawing his opinion upon (the Medical Kite). He has indicated no familiarity with the

14   instructions pertaining to that item, which include admonitions not to list multiple symptoms

15   or problems on one Kite. SSDF 13. The opinion also fails to in any way to address the

16   considerable number of facts regarding Scott's physical condition on the day of his death

17   contained in the current record including those of Dr. Omalu, which are addressed in

18   Omalu's Rule 26 Report. See Declaration of Stewart Katz, Exhibit 2.

19   In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993), the

20   Supreme Court described trial court judges as the gate-keepers of the evidence sought to be

21   introduced under Rule 702 of the Federal Rules of Evidence. Under this Rule, a trial judge

22   must ensure that all expert testimony admitted is not only relevant, but reliable. Specifically,

23   Rule 702 under *Daubert* requires consideration of whether: (1) the reasoning or

24   methodology underlying the testimony is scientifically valid (the reliability prong); and (2)

25   whether that reasoning or methodology properly can be applied to the facts in issue (the

26   relevancy prong) (*Id.* at 592-93), or in other words, is "helpful to the jury" in understanding

27   the evidence or determining the ultimate issue of fact. *Elsayed Mukhtar v. California State*

28   *University*, 299 F.3d 1053, 1064, n.7 (9th Cir. 2002) (citing *United States v. Rahm*, 993 F.2d

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

1405, 1413 (9th Cir. 1993)). An expert must "explain the methodology . . . followed to reach [his or her] conclusions." *See Daubert v. Merrell Dow Pharms, Inc.,* 43 F.3d 1311, 1319 (9th Cir. 1995) ("*Daubert II* "); *Claar v. Burlington N. R.R. Co.,* 29 F.3d 499, 502 (9th Cir. 1994) ("[T]he district court repeatedly ordered  the experts to explain the reasoning and methods underlying their conclusions . . . . [Because the experts'] affidavits are devoid of any such explanation . . .  the district court could not make the findings required by Rule 702[.]"); *United States v. Rincon,* 28 F.3d 921, 924 (9th Cir. 1994) (explaining that the methods used by the expert must be described "in sufficient detail" such that the district court can determine if they are reliable).

There is simply no articulated basis for Arenson's opinion "it is improbable that a patient seeking medical attention would fail to note that there was blood in the vomitus if indeed that had been the case prior to completing the document (medical kite)." This opinion is expressed as a probability (with no statistical explanation) and falsely suggests a degree of reasoning or study that is absent.

The second seemingly non-medical opinion which Dr. Arensen expresses is that "deputies were unaware of blood in the decedent's emesis until 2155 hours when the deputies found Mr. Scott in his cell…." This opinion on its face is a speculative non-medical opinion. While this opinion is also subject to the qualification that it is based upon the unspecified "documents provided to me," it is a reasonable assumption that those documents did not include any of the disputing evidence cited in the responses to the Defendants' Statement of Undisputed Facts numbered 2, 3, 4, 7, 8, 9, 10, 12, 13, 15, 16, 17 and 18.

Dr. Arenson provides no medical or scientific explanation to support his conclusions as to what the deputies "knew." A statement does not become medical knowledge just because it is uttered by a physician.  *Henricksen v. Conoco Phillips Co*., 605 F. Supp. 2d 1142, 1154 (E.D. Wash. 2009) (citing *Daubert II*, 43 F.3d at 1316). "[T]he expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Id.* (citing *Daubert II* 43 F.3d at 1315-

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

11

16.) Further, when "an untrained layman could produce the same information as found in [the expert's] report because of its lack of scientific knowledge and use of methodology," the opinion is inadmissible. *Figueroa v. Simplicity Plan de Puerto Rico*, 267 F.Supp.2d 161, 166-7 (D. P.R., 2003) (citing *United States v. Brien*, 59 F.3d 274, 277 (1st Cir. 1995)).

Dr. Arenson is also not qualified to opine regarding the cause of death. Dr. Arenson is not a pathologist. The fact attributed to him regarding the cause of death is outside of his expertise although certainly within the expertise of Dr. Reiber, whose declaration is Exhibit S to the declaration of Jesse Rivera in support of the motion for summary judgment as well Dr. Omalu, whose declaration is Exhibit 2 to Stewart Katz's Declaration in opposition to the motion for summary judgment. A recent example of a section 1983 case arising from a correctional setting where a non-pathologist physician was barred from testifying as to the cause(s) of death may be found in *Clarke v. Schofield* 632 F. Supp. 2d 1250 (M.D. Georgia 2009).

For these reasons, Arensen's opinions regarding the three areas indicated above should be disregarded and/or stricken by the Court.

## II.  SCOTT'S MEDICAL NEED WAS, OBJECTIVELY, SUFFICIENTLY SERIOUS.

"A "serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991) (overruled on other grounds) (quoting *Estelle*, 429 U.S. at 104).). Defendants do not dispute that Scott suffered from a sufficiently serious medical need on January 6, 2012. He died on January 6, 2012 as a result of espohogal tears and resultant bleeding caused by unchecked vomiting. (SSDF 2.) This was, objectively, a sufficiently serious medical need.

## III.  CAUSATION IS SATISFIED FOR ANY THEORY OF LIABILITY ADDRESSED IN THIS OPPOSITION

Mark Scott was vomiting blood and/or coughing up blood for at least 14 hours prior to his death on January 6, 2012. SSDF 19. Blood in vomit is an indicator of a serious

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

12

emergent medical need which is easily treated. SSDF 17.  Scott's emergent medical need could have been easily and successfully addressed through medical intervention, the need for which was apparent. SSDF 17. The failure to obtain medical treatment caused Mark Scott's death. SSDF 17, 54. Any deputy could have sent him down to medical staff at any time but did not do so. SSDF 8.

**IV. PLAINTIFFS HAVE PUT FORTH SUFFICIENT EVIDENCE FOR A JURY TO FIND THAT DEFENDANTS TIDWELL, BECKER, PANTOJA AND MATRANGA WERE, SUBJECTIVELY, DELIBERATELY INDIFFERENT.**

**A.  Timeline of Events: Tidwell and Becker**

On January 6, 2012, Mark Scott was housed in cell 303 on the 5 East Floor of the Sacramento County Main Jail. SUMF 2. Each housing unit at the jail is normally staffed by two deputies, one of whom must be in the control room at all times. There is no formal assignment as to which deputy fulfills which duties at which time during the shift. In this case, all the relevant conduct occurred in the housing unit referred to as 5 East Floor.

Richard Vega was Scott's cellmate in cell 303 on the 5 East Floor. SSDF 21. On January 6, 2012, Scott began vomiting after breakfast, which was served by the night shift prior to the arrival of Deputies Tidwell and Becker that day. SSDF 19. By 1000 hours, Scott was visibly and seriously ill and throwing up or coughing up blood. SSDF 19.

All cells, including Scott's, had a button connected to an intercom for communicating with the deputies in the control room about emergencies. SSDF 6. Pressing the button signaled the desire to talk but the deputy in the control room must activate the intercom in order to hear the inmate. SSDF 6. Both Scott and Vega unsuccessfully used the intercom in multiple attempts to get medical help for Scott from the deputies that day. SSDF 22. Scott had asked Vega to use the intercom button to call for help on his behalf. SSDF 22. Vega specifically told the deputies via the intercom that Scott was sick and throwing up blood and that he needed to get Medical attention. SSDF 27. Throughout the day, Scott and Vega hit the emergency button at least ten times between them. SSDF 22.

Deputies Tidwell and Becker were the deputies assigned to work 5 East Floor during the day shift on January 6, 2012, from 0600 to 1800 hours. SUMF 2, 4. Tidwell and Becker

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION

13

1   both worked in the control room, among other duties, and shared the roles of floor officer

2   and control room officer equally between them. SSDF 23.

3          Although Scott and Vega hit the emergency button at least ten times that day, and in

4   fact Vega spoke to the deputies in the control room on multiple occasions, Deputy Tidwell

5   claims he only answered a single call regarding Mark Scott, at approximately 1640 hours.

6   SSDF 22. Deputy Becker was only off the floor for one hour during his shift that day.

7   SUMF 4, 10. Thus it can be reasonably inferred that Scott and/or Vega spoke directly to

8   Deputy Becker over the intercom that day on multiple occasions between 0600 hours and

9   1800 hours.

10          Significant evidence, both direct and circumstantial, demonstrates that both Tidwell

11   and Becker both ignored a substantial, known risk to Plaintiff's health and safety. Scott was

12   already visibly sick and vomiting before Tidwell and Becker arrived at approximately 1600

13   hours. SSDF 19. According to the logbook, Deputy Becker conducted a security count that

14   morning at 0648 hours and conducted cell checks at 0841, 0935 and 1035 hours. SUMF 2.

15   Scott began vomiting or coughing up blood at approximately 1000 hours. SSDF 19. At some

16   point that morning, Scott's cell mate, Vega, flagged down a white deputy with a medium

17   build who was performing count and told the deputy that Scott was throwing up blood.

18   SSDF 25. Vega showed the deputy that there was blood in the toilet and on tissue that Scott

19   had used to wipe his mouth. SSDF 25.

20          Deputy Becker is Caucasian and Deputy Tidwell is African American. SSDF 24.

21   Based on Vega's description, and since Vega knew Deputy Tidwell by name and face, it can

22   be reasonably inferred that Vega spoke directly to Becker about Scott being sick and

23   vomiting blood that morning. This is strong circumstantial evidence that Becker was on

24   actual notice that Scott was seriously ill and vomiting or coughing up blood, or otherwise

25   bleeding from his mouth, from at least 1035 hours forward.

26          Lunch was served at 1035 hours. SSDF 26. Scott was sick and did not eat. SSDF 26.

27   Around lunch time, numerous witnesses including Travis Davis heard Deputy Tidwell and

28   Vega arguing over the cell intercom about Scott being sick and needing medical attention.

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE
COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

1   SSDF 27. During this argument over the intercom, Vega clearly told Deputy Tidwell that

2   Scott was ill and bleeding and that he needed medical attention. SSDF 27. Deputy Tidwell

3   yelled and cursed at Vega for pushing the emergency button. SSDF 27. This is direct

4   evidence that Tidwell was on notice that Scott was seriously ill and bleeding from

5   approximately lunch time forward.

6          According to the log book, Deputy Tidwell conducted further cell checks at 1125

7   and 1216 hours, and Deputy Becker conducted a cell check at 1305 hours. SUMF 2, 3. The

8   purpose of a cell check is to check on the welfare of the inmates by viewing each inmate in

9   his cell. SSDF 3. Tidwell and Becker both claim to have noted "nothing unusual" and to

10  have observed "no indication of illness or distress" and had "no communications from Mark

11  Scott or his cellmate" during these cell checks. ECF No. 65-1 at 28. As demonstrated, these

12  assertions are disputed, as Scott was visibly sick and coughing up or vomiting blood this

13  entire time. SSDF 19, 25. Moreover, Vega had already spoken directly both to Becker, in

14  person, and to Tidwell, over the intercom, and directly informed both was sick and vomiting

15  blood before these cell checks occurred. SSDF 25, 27.

16         Deputy Tidwell claims that during a cell check at 1500 hours, he spoke to Mark

17  Scott at Scott and Vega's cell and that this is when Scott first informed him that Scott "felt

18  sick and had vomited." SUMF 3. Logbooks are official records that are supposed to be

19  accurate. SSDF 5. Regardless, logbooks at the Sacramento County Main Jail routinely

20  contain errors. SSDF 5. In this instance, although the logbook indicates that a cell check

21  occurred at 1500 hours, it says nothing about Tidwell's claimed discussion with Mark Scott

22  at that time, and nothing about Tidwell having been notified that Scott was sick until much

23  later, at 1645 hours. SUMF 10, 11. The time of 1645 hours was the time Tidwell noted in

24  the logbook that he called medical staff at 2M regarding Scott's "complaint." SUMF 11.

25  This was more than seven hours after direct evidence demonstrates that he was actually on

26  notice that Scott was sick and vomiting or coughing up blood. SSDF 26, 27.

27         After Scott's death, Tidwell created report MJD 2012-004722, dated January 7,

28  2012. SSDF 39. In this first report bearing this number and date, Tidwell makes no mention

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE
COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

1    of talking to Mark Scott or of Scott requesting medical care at 1500 hours; but rather,

2    reported the first relevant timeline event at 1640 hours, stating that Vega pressed the

3    emergency button at that time on Scott's behalf and that Tidwell "immediately" called

4    medical staff. SSDF 39.

5        Tidwell subsequently, days later, created a second report with a different timeline of

6    events that was deceptively and inaccurately dated January 7, 2012, just like his first report.

7    SSDF 40, 41. This second report also inaccurately bears the exact same report number and

8    time of creation as the first report. SSDF 40. Tidwell's second report was intended to totally

9    replace his first report, as it was thought that the first, more contemporaneous report would

10   disappear. SSDF 41. It can be reasonably inferred that the differences, significantly the

11   additions, in the second report exist because it had become evident that Tidwell had failed to

12   include, and/or because he was attempting to alter, important details such as the fact that he

13   was actually notified of Scott's illness much earlier than he untruthfully indicated in his first

14   report or in the logbook.

15       In his second report, Tidwell claimed that he arrived back to the control room at

16   approximately 1510 hours and called medical staff regarding Scott at "approximately 1630

17   hours" which is 18 minutes prior to the time recorded in the log book, and much closer to

18   the actual time of 1618 when the call likely took place. SUMF 4; SSDF 42. It is known that

19   Tidwell's call to medical staff took place at or prior to 1618 hours because electronic records

20   indicate that Nurse Skerritt accessed Scotts' medical records at that time. SUMF 4.

21       Sometime in the afternoon, Lovie James spoke to Tidwell face to face and told

22   Tidwell that Scott had been spitting up/vomiting blood all day and that he needed medical

23   attention. SSDF 28.

24       Dinner arrived on the floor at 1620 hours. SSDF 29. After dinner, Vega hit the

25   emergency button again and called out "man down," after which Deputy Tidwell responded

26   to Scott and Vega's cell. SUMF 7, 8. When Tidwell arrived at the cell, he and Vega had an

27   argument about Scott needing, but not receiving, medical help. SSDF 30, 31. Vega said to

28   Tidwell something to the effect of, "Hey, my cellie's over there half way on his death bed,

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE
COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

coughing up blood and everything." SSDF 31. It was obvious that Scott needed to go the emergency room. SSDF 31. Vega also told Tidwell directly that Scott was vomiting "straight out blood." SSDF 31. Vega pointed out the toilet full of bloody water to Tidwell. SSDF 31. Even though it was obvious that Scott needed medical attention, Tidwell flat out refused to call medical again, and told Vega to "kick back" off the emergency button. SSDF 31. Tidwell also said that Mark was "crying wolf." SSDF 31. Vega argued with Tidwell and cussed at him. SSDF 31. Vega asked Tidwell how could Scott be crying wolf when there was blood? SSDF 31. Tidwell acknowledged to Vega that he knew Scott was sick and that blood was coming out of his mouth. SSDF 31. However, he said that he had called Medical and that he was not going to do anything else. SSDF 31. Tidwell slammed the door in Vega's face and walked away. SSDF 31.

The argument after dinner was heard by Travis Davis, Chema Strawther, and Lovie James, who were all housed near Scott and Vega's cell. SSDF 30, 32, 33. Davis heard Deputy Tidwell having a "very heated argument" with Vega. SSDF 32. Tidwell was mad and yelling. SSDF 32. Davis confirms that Vega told Tidwell that Scott was bleeding and needed help. SSDF 32. Chema Strawther saw Vega and Scott's cell door open and saw Tidwell standing there. SSDF 33. Tidwell said loudly and aggressively words to the effect of "Don't push my fucking button anymore!" SSDF 33. Tidwell said he had spoken to the nurse and that Scott was not going to be seen and that the nurse said Scott should drink water. SSDF 33. Vega was yelling to Tidwell, "Look at the blood, look at the blood!" SSDF 33. Strawther heard Vega telling Tidwell to look at the blood in a bag and in the toilet. SSDF 33. Tidwell replied that he did not need to look in the bag because he could see the blood. SSDF 33. The argument ended with Tidwell declaring that he was not going to do anything else. SSDF 33. Vega was still loudly pleading for help for Scott when Tidwell left. SSDF 33. Strawther did not hear Scott say anything during this argument. SSDF 33.

It was after this heated argument that Tidwell finally recorded in the logbook that he had been notified that Scott was ill (he recorded the time as 1645) (SUMF 7, 11), although he was actually notified more than five hours prior (SSDF 26, 27).

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

1    Tidwell reportedly conducted one more security count, at 1730 hours, prior to the
2    end of his shift. SUMF 12. Scott was seriously and visibly ill at that time and both Deputies
3    Tidwell and Becker knew it. SSDF 17, 18, 19, 22, 25, 27, 28, 30, 31, 32, 33.

4    During the change in shift at 1800 hours, Tidwell relayed to Deputies Matranga and
5    Pantoja that Scott was sick and vomiting and that medical staff had been called but never
6    seen. SUMF 14. The purpose of a "pass along" or information exchange at shift change is to
7    inform newly arrived deputies of pertinent details that would be important for them to know
8    and which would potentially come up during the oncoming shift. SSDF 34. Along with the
9    plentiful disputing evidence already set forth, the fact that Tidwell recognized the
10   importance of relaying this information in the pass along is inconsistent with defendants'
11   current claims that Scott was "up and alert with no signs of distress or discomfort at 1730
12   hours." SUMF 12.

13   **B.  Timeline of Events: Pantoja and Matranga**

14   Deputies Pantoja and Matranga arrived in the control room of 5 East Floor for the
15   night shift at 1815 hours. SUMF 14. They were both already on notice that Scott was sick
16   and vomiting and had not been seen by medical staff. SUMF 14.

17   Deputy Pantoja purports to have conducted a security count at 1825 hours and to
18   have made eye contact with Scott, who did not appear to be in distress. SUMF 15. Plaintiffs
19   dispute this claim, as it was apparent that Scott was in extreme distress, non-communicative,
20   in a blood splattered cell, and in need of immediate medical attention at this time. SSDF 17,
21   18, 19, 22, 25, 27, 28, 30, 31, 32, 33.

22   Deputy Pantoja also claims he conducted a cell check at 1935. SUMF 15. This claim
23   is contradicted by Defendants' own evidence. No cell check was done at or around this time.
24   SSDF 35.

25   Deputy Pantoja claims he conducted further cell checks at 2035 and 2130 hours and
26   "did not observe anything unusual." SUMF 17-18. If these cell checks were performed and
27   Pantoja did not observe anything unusual, then they were not plainly performed properly.
28   The purpose of a cell check is to check on the welfare of inmates by viewing each inmate in

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE
COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

his cell. SSDF 3. It was apparent that Scott was in extreme distress, non-communicative, in a blood splattered cell, and in need of immediate medical attention at this time. SSDF 17, 18, 19, 22, 25, 27, 28, 30, 31, 32, 33.

Moreover, direct evidence disputes Deputy Pantoja's claim that he did not observe anything unusual. Sometime after the shift change at 1800 hours, Vega saw Deputy Pantoja performing count. SSDF 36. Vega told Pantoja directly that Scott was sick and vomiting blood. SSDF 36. Scott was visibly ill, non-communicative, in blood spattered cell, and obviously in need of immediate medical attention. SSDF 17, 18, 19, 22, 25, 27, 28, 30, 31, 32, 33. Vega stressed to Pantoja the severity of Scott's poor condition and again begged for help, but Deputy Pantoja refused to summon medical assistance. SSDF 36.

Dayroom, which is when inmates can leave their cells for recreational activities or to attend to their personal needs, occurred from approximately 1830 to 1955 hours. SSDF 37. Vega pressed the emergency button multiple additional times during the second shift, both before and after this evening dayroom. SSDF 37. Deputy Matranga manned the control room from the beginning of the second shift until approximately 2150 hours. SUMF 19. Thus, Deputy Matranga either chose not to answer the emergency button or answered and heard Vega's pleas for help, but nevertheless chose not to contact medical staff or send Scott down for medical treatment. SSDF 37; SUMF 19.

At 2150 hours, Deputy Pantoja took over the control room for Deputy Matranga. SUMF 19. Almost immediately, at 2154 hours, Deputy Pantoja answered an intercom call from Vega. SUMF 20. Deputy Pantoja called Matranga to return to the control room and Pantoja responded to Scott's cell. SUMF 22. Deputy Matranga called medical staff. SUMF 22. Nurses and fire department personnel responded, but it was too late; Scott was officially pronounced dead at 2222 hours. SUMF 24.

### C.  Objective Evidence Confirming Scott's Condition

After Scott's death, homicide detective Jeffrey Wallace made several observations regarding the objective evidence in Scott and Vega's cell. Specifically, there was dried blood visible on the floor of the cell and on the wall, as well as a paper bag containing vomit

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

19

1   which contained both dried blood and still wet blood, as well as dried blood on the outside

2   of the bag. Deposition Transcript of Jeffrey Wallace, copies of the relevant portions of

3   which are attached as Exhibit 17 to the Declaration of Stewart Katz (hereinafter "Wallace

4   DT") at 7:18-9:1, 10:21-15:15.

5          There were droplets of blood on the floor which indicated "a pattern of possible

6   movement of Mr. Scott from the bed outward to what looked like to the middle or to the

7   door of the pod," and movement from the lower portion of the bunk toward the door of the

8   cell. Wallace DT at 13:9-19. There were blood smears indicating that Scott probably… had

9   blood on his hands… [a]nd then, when he touched the door hinge or the wall next to it, left a

10  blood transfer stain." Wallace DT 13:24-14:4. There were also dried blood smears above the

11  door hinge that could have been from a cough or from his hand. Wallace DT 14:11-15.

12  These dried blood drops and stains are distinguished from the pool of fresh blood

13  underneath Scott's body which resulted from the repositioning of his body from the bed to

14  the floor. Wallace DT 15:5-15. The significance is that former was there long enough to dry.

15         **D.  Tidwell's Admission at the Redline Assembly**

16         When Tidwell returned to work after Scott's death, he addressed the entire 5 East

17  Floor housing pod in what was called a "redline" assembly meaning that all the inmates

18  came out of their cells and stood on the red line that was on the floor. SSDF 38. Tidwell

19  stated he wanted to "clear the air" but things got heated. SSDF 38. A number of inmates got

20  into a verbal confrontation with Tidwell and told him that they blamed him, because of his

21  inaction, for Scott's death. SSDF 38. Tidwell conceded that he knew Scott was seriously ill

22  and bleeding, in words close to the following: "I know what you guys are talking about, I

23  saw the blood but all I can do is call medical and that's what I did." SSDF 38. Tidwell stated

24  if the inmates wanted to blame someone, they should blame the "people downstairs" (i.e.,

25  medical staff). SSDF 38. As things continued to boil, another deputy took over for Tidwell

26  and the redline assembly ended shortly thereafter. SSDF 38.

27  ////

28  ////

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE
COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

E.  **Argument**

A report that an inmate is vomiting blood obviously indicates the inmate is in need of immediate medical attention. SSDF 20. Significantly, any of the deputies could have sent Scott down to see medical staff at any time. SSDF 10. They failed to do so, or take any other corrective action regarding Scott's actual emergent need for medical care (as opposed to mere "vomiting") in deliberate indifference to his serious medical needs, resulting in his death.

Plaintiffs have presented evidence from which a jury could and should find that Deputies Tidwell, Becker, Matranga and Pantoja were deliberately indifferent. There is both direct and circumstantial evidence demonstrating that each deputy possessed awareness of facts from which he could infer that a substantial risk of harm existed. In addition, ample circumstantial evidence, in particular the severity of Scott's condition and the obviousness of his need for emergent medical care, demonstrates that each actually drew that inference. *See Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) ("[D]eliberate indifference to medical needs may be shown by circumstantial evidence.") (citing *Farmer*, 511 U.S. at 842; *see also Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (internal quotation marks omitted) ("Because government officials do not readily admit the subjective component of this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence."); *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) ("Subjective awareness and deliberate indifference normally can be proved only with circumstantial evidence."); *see also LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001) ("'[A] prisoner is not required to show that he was literally ignored by the staff to prove an Eighth Amendment violation, only that his serious medical needs were consciously disregarded.") (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

V.  **PLAINTIFFS HAVE PUT FORTH SUFFICIENT EVIDENCE FOR A JURY TO FIND DEFENDANTS BREWER, RICHAEL AND THE COUNTY OF SACRAMENTO LIABLE ON A SUPERVISORY THEORY OF LIABILITY**

Under section 1983, a person "subjects" another person to a deprivation of a constitutional right "if he does an affirmative act, participates in another's affirmative acts

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

21

or omits to perform an act which he is legally required to do that causes the deprivation of which the complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). Personal participation in the deprivation "is not the only predicate for section 1983 liability." *Id.*; *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). "A supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Redman v. Warden of San Diego*, 942 F.2d 1435, 1446-47 (9th Cir. 1991).

The Ninth Circuit has summarized regarding supervisory liability in section 1983 cases:

> Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others.

*Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005); *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000) (citing *Larez v. City of Los Angeles*, 946 F.2d at 646; see also Ninth Circuit instruction 9.3.[1]

The requisite causal connection for liability under section 1983 can be established "by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978).) When the defendant is a policymaker, the requisite causal connection for supervisory liability can also be shown through a ratification theory of liability based on post-event evidence. *Henry v. County of Shasta,* 132 F.3d 512, 520 (9th

---

[1] The Ninth Circuit Model Civil Jury Instruction 9.3, "Section 1983 claim against supervisory defendant in individual capacity – elements and burden or proof," tracks the language of *Larez* stating that "In order to prevail on his § 1983 claim against the supervisory defendant…the plaintiff must prove [that] the defendant set in motion a series of acts by his subordinates that he knew or reasonably should have known would cause the subordinates to deprive the plaintiff of [his] rights."

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

Cir. 1997) ("subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy"); *see also Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985); Ninth Circuit instruction 9.6. Ratification exists where an authorized policymaker knew of and approved a subordinate's decision and the basis for it. *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).

"When a county continues to turn a blind eye to severe violations of inmates' constitutional rights - despite having received notice of such violations - a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference." *Henry v. County of Shasta,* 132 F.3d at 519. In the absence of evidence of multiple previous violations, even a single episode of dangerous recklessness ratified by a policymaker is sufficient for a jury to conclude that "it was accepted as the way things are done and have been done[.]" *Grandstaff v. City of Borger*, 767 F.2d at 171 (explaining that the reaction to a single, gross incident of abuse of a deadly weapons policy said more about the existing disposition of the City's policymaker than would a dozen previous incidents of excessive force).

### A.  Defendant Brewer

Caryl Skerritt was negligent[2] in her treatment of Mr. Scott on January 6, 2012 and clearly disregarded Correctional Health Services ("CHS") procedures. SSDF 55. Her failure to provide treatment for Scott was a substantial factor in the cause of his death. SSDF 54.

Aron Brewer was the Chief of CHS on January 6, 2012. SUMF 31. He was a non-medical official who was responsible for the overall administration of the CHS program. He was responsible for the creation and implementation of administrative policies. SUMF 31; SSDF 56. Any disciplinary action against Nurse Skerritt would require an investigation, which Brewer had to initiate. SSDF 57.

---

[2] Plaintiff acknowledges the court's previous ruling in Defendant Caryl Skerritt's motion for summary adjudication. However, Plaintiff does not concede that either this cause of action, or the cause of action for deliberate indifference against Skerritt, is insufficient.

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

CHS medical staff conducted a peer review to evaluate the performance of registered nurse Caryl Skerritt in regard to her non-treatment of Scott's medical condition on January 6, 2012. SUMF 31. The purpose of a peer review is to help assure the quality of medical and nursing care through the safe deliverance of standards of care and newly discovered evidence-based practices. SSDF 60. The peer review committee was composed of Dr. Padilla, the Medical Director, Pamela Harris, the Director of Nursing, and other medical professionals whose opinions Brewer trusted. SSDF 59. The peer review committee unanimously found that Skerritt's conduct fell below the standard of care of a competent registered nurse when she (1) failed to initiate transport of Scott for a physical objective assessment; (2) failed to refer him to the flex nurse for immediate assessment; (3) failed to document her interventions and communication in Scott's medical record; (4) failed to inquire as to the severity of Scott's condition; and (5) giving instructions to a vomiting patient to drink water without performing an objective and subjective assessment. SSDF 59.

This was not the first time that Skerritt failed to follow CHS protocol and, specifically, failed to assess a patient in violation of protocol. SSDF 52. Her personnel file contained a notice of verbal counseling dated September 9, 2010 which described the former misconduct as: "You did not see the patient; rather you gave him a pink slip and asked him to sign up for [nurse's sick call] indicating that it was not urgent." SSDF 52.

The peer review committee voted unanimously to recommend that Skerritt be disciplined. SSDF 59. Despite having committing misconduct in failing to assess a patient, which, this time, resulted in an inmate's death, and despite the unanimous recommendation of the peer review committee, whose judgment Brewer trusted, Brewer refused to authorize an investigation into Nurse Skerritt's conduct in regard to Mark Scott's death. SSDF 59. The acquiescence by Mr. Brewer to Skerritt's misconduct in failing to assess a patient, for the second time, and which actually resulted in an inmate's death, is evidenced not only by his affirmative decision not to initiate a formal investigation or any discipline, but also by his failure to recognize and accord any weight to the fact that Skerritt was previously

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

24

disciplined for similar misconduct, even though the letter of counseling evidencing this prior misconduct was present in her personnel file. SSDF 52.

In the aftermath of an event such as an inmate death, it is essential that a Correctional facility fully investigate what occurred, why it occurred, and what can be learned from the incident, as well as whether any errors occurred by medical staff, so that such errors can be avoided in the future. SSDF 43. Brewer affirmatively, and singlehandedly, prevented such an investigation from occurring in this case. SSDF 59.

As in the case *Grandstaff v. City of Borger*, 767 F.2d 161, Brewer's reaction, as a policymaker, to this single, gross instance of misconduct by Skerritt which resulted in an inmate's death, is more probative than would be multiple previous incidents of minor misconduct. His reaction, and specifically his failure to discipline or even investigate, proves his preexisting disposition. *Id.* at 171; *see also Henry v. County of Shasta,* 132 F.3d at 519.

On these facts, there exists "a genuine issue of material fact as to the question whether [Brewer] acted with deliberate indifference to the subordinate's constitutional violations." *Christie v. Iopa*, 176 F.3d at 1240; *Larez v. City of Los Angeles*, 946 F.2d at 646; *Malott v. Placer County*, No. 2:14-CV-1040 KJM EFB, 2014 U.S. Dist. LEXIS 161070 (E.D. Cal. Nov. 14, 2014) (holding that rejection of a citizen complaint without looking at proffered evidence was sufficient to plead ratification); *Dorger v. City of Napa*, No. 12-cv-440 YGR, 2012 WL 3791447, at *5-6 (N.D. Cal. Aug. 31, 2012) (holding that ratification was shown by facts that city delayed investigation and disregarded contradictory evidence).

## B.  Defendant Richael

There is also a genuine issue of material fact regarding whether Defendant Richael acted with deliberate indifference to her subordinates' constitutional violations.

Captain Richael was the Commander of the Sacramento County Main Jail. SUMF 36. Richael oversaw the operations of the Sacramento County Main Jail. SUMF 36. Richael

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION

25

1   had policymaking authority regarding corrections operations and had the authority to initiate

2   discipline of correctional staff. SUMF 36; SSDF 47.

3       In her capacity as Commander of the Sacramento County Main Jail, Richael

4   participated in an "In Custody Death Review" on January 25, 2012. SUMF 36. Richael

5   claims to have reviewed the Death Binder that was prepared regarding Scott's death, and

6   there was an expectation that she would carefully do so. SUMF 36; SSDF 47. A Death

7   Binder is a collection of many separate documents including reports prepared by staff.

8   SUMF 36. The Death Binder included various inmate statements contradicting the deputies'

9   accounts of events on January 6, 2012. SSDF 47. Richael's focus was whether the deputies

10  working on 5 East acted in a manner inconsistent with the Sheriff's Department's policies.

11  SUMF 36.

12      Sacramento County Sherriff's Department policy requires custody staff (including

13  deputies) to notify CHS medical staff of inmate medical complaints. SUMF 36. In this case,

14  Deputies Tidwell, Becker, Matranga and Pantoja did not comply with Sacramento County

15  Sheriff's Department policies. They did not properly perform cell checks and on at least one

16  occasion did not perform cell checks at all. SSDF 35. Except for a single cryptic call to

17  Nurse Skerritt by Deputy Tidwell, they each failed to notify medical staff regarding Scott's

18  emergent medical needs, even after becoming aware that Scott was vomiting or coughing up

19  blood. SSDF 17, 18, 19, 22, 25, 27, 28, 30, 31, 32, 33, 36, 37. They also failed to accurately

20  document events in the logbook, which is an official document and which is supposed to be

21  accurate, and failed to accurately record the events of that day in other official reports.

22  SUMF 7, 11; SSDF 5, 39, 40, 42.

23      However, at the in-custody death review, there was no discussion or even any

24  mention about the possibility that there had been any delay in contacting medical or that

25  there were reports of continued vomiting by Scott. SSDF 49. Assuming that Richael read the

26  Death Binder, as she claims to have done, she knew that multiple inmate witnesses were

27  claiming that the deputies were all well aware of reports of Scott having been continuously

28  vomiting, including vomiting blood, all day. SSDF 47. However, there was never any

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

discussion of these multiple inmate witnesses' statements which clearly contradicted the deputies' statements. SSDF 49. These allegations should have been investigated. SSDF 43, 50. However, despite purportedly having knowledge of the inmates' statements, Richael's explanation for not investigating the allegations contained therein was that since it did not happen, it did not need to be investigated. SSDF 50.

In the aftermath of an event as serious as an inmate death, it is essential that a Correctional facility fully investigate what occurred, why it occurred and what can be learned from the incident, as well as whether any errors occurred by correctional staff, so that such errors can be avoided in the future. SSDF 43. Here, other than the inadequate "In Custody Death Review," during which there were no discussions of the deputies' violations of policy or the inmate witness statements which materially contradicted the deputies' accounts of events, there were no meetings regarding, nor any discussions of lessons to be learned from, Scott's death. SSDF 45, 48, 49, 50. As just one example, no supervisor ever questioned Tidwell about his conduct that day or about the inaccuracies and inconsistencies contained in the first report he drafted. SSDF 48.

Richael's reaction, as jail commander and policymaker with authority to initiate discipline of correctional staff, to this single, gross instance of constitutional violations by correctional deputies which resulted in an inmate's death, is highly probative of her preexisting disposition. *Grandstaff v. City of Borger*, 767 F.2d at 171; *Henry v. County of Shasta,* 132 F.3d at 519. Simply put, there is evidence from which a jury could conclude that Richael knew of, and approved, her subordinate deputies' unconstitutional conduct and the basis for it. *Christie v. Iopa*, 176 F.3d at 1239.

There is additionally evidence of that Richael and the County had a policy of not investigating, but instead ratifying, the misconduct or errors by correctional staff. From at least 2007 forward, the Sacramento County Sheriff's Department has never found a deputy to have any culpability, even partial responsibility, for the death of an inmate. SSDF 44. Moreover, according to Richael, while she was commander at the main jail, no deputy's failure to act has ever contributed to an inmates' medical condition worsening. SSDF 51. In

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

27

1  sum, her knowledge of the culpable actions of her subordinates, coupled with her inaction

2  and affirmative decision not to formally investigate or discipline any deputy, as well as the

3  evidence of prior policy in this regard, demonstrates acquiescence to and ratification of her

4  subordinates' unconstitutional conduct. *Larez v. City of Los Angeles*, 946 F.2d at 636;

5  *Grandstaff v. City of Borger*, 767 F.2d at 171.

6   **VI. PLAINTIFFS HAVE PUT FORTH SUFFICIENT EVIDENCE FOR A JURY
7   TO FIND DEFENDANT COUNTY OF SACRAMENTO LIABLE BASED ON
8   ITS POLICIES AND PROCEDURES FOR INMATE ACCESS TO MEDICAL
     CARE.**

9       A plaintiff in a section 1983 action may recover from a local government entity if his

10  or her injury resulted from an official policy, custom or usage, or from a policy of inaction

11  when such inaction amounts to a failure to protect constitutional rights. *City of Canton v.*

12  *Harris*, 489 U.S. 378, 388-89 (1989). Focusing their argument exclusively on the existence

13  of the policy "Correctional health Services, Abdominal Complaints, Standardized Nursing

14  Procedure 6, Revised 2/2010," Defendants assert that the County's customs, policies or

15  practices did not cause a constitutional violation in this case. ECF No. 65-1 at 50.

16  Defendants are wrong. A jury could find Scott's death resulted from deficiencies and

17  omissions in the County's policies and procedures for inmates' access to emergent medical

18  care.

19       Liability imposed for an entity's inaction or omissions in its policies does not require

20  that the entity's policies were facially unconstitutional or that the municipality directed an

21  employee to take an unconstitutional action. *See City of Canton v. Harris*, 489 U.S. at 378-

22  89. To impose entity liability for an entity's inaction or omissions in policies, a section 1983

23  plaintiff must establish: (1) that he possessed a constitutional right of which he was

24  deprived; (2) that the entity had customs, policies or practices that amounted to deliberate

25  indifference; and (3) that these policies were the "moving force" behind the constitutional

26  violation. *Gibson v. County of Washoe*, 290 F.3d at 1194; *see also Oviatt v. Pearce*, 954

27  F.2d 1470, 1474 (9th Cir. 1992) *citing City of Canton*, 489 U.S. at 389-91.

28

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE
COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

Deliberate indifference under this route to entity liability does not contain a subjective element. *Gibson v. County of Washoe*, 290 F.3d at 1195 (citing *Farmer v Brennan*, 511 U.S. at 841). Plaintiffs need not demonstrate that the County had the state of mind required to prove the underlying violation or even that they knew the policies were deliberately indifferent. *Gibson v. County of Washoe*, 290 F.3d at 1195 ("Unlike the deliberate indifference standard used to determine if a violation of a detainee's right to receive medical care took place, [the *City of Canton*] standard does not contain a subjective component."); *see also Farmer*, 511 U.S. at 841 (explicitly distinguishing the two standards on this basis).

Mark Scott had a clearly established right not to have county officials be deliberately indifferent to his serious medical needs. *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996). In addition, there is sufficient evidence from which a jury could find that the Sacramento County Sheriff's Department had customs, policies or practices that amounted to deliberate indifference, and that these policies were the "moving force" behind the constitutional violation. Accordingly, summary judgment is inappropriate for the County of Sacramento.

**A. The deficiencies in the County's policies for inmate access to emergent medical care, as well as the need to remedy them, were so obvious that the County's failure to do so constitutes deliberate indifference.**

When the need for more or different action "is so obvious, and the inadequacy of the current procedure so likely to result in the violation of constitutional rights, [ ] the policymakers… can reasonably be said to have been deliberately indifferent to the need." *Oviatt v. Pearce*, 954 F.2d at 1478 (internal brackets removed) (citing *City of Canton*, 498 U.S. at 390). "Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury." *Oviatt v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992) (citing *Davis v. Mason County*, 927 F.2d 1473, 1482 (9th Cir.), cert. denied, 112 S. Ct. 275 (1991).)

It is a uniform and necessary practice to have a system in place to allow inmates to seek medical care. SSDF 9. On January 6, 2012, under the County's policies and procedures dealing with inmates' access to medical care, Mark Scott had two options for obtaining

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

29

medical care: (1) contacting custody staff, and (2) filling out a Kite. SSDF 10. Aside from these two options, there was nothing else he could have done on the day of his death to get medical care. SSDF 20.

A Medical Kite is the paper document which inmates can fill out with their medical complaints. SSDF 10. In order for a system to effectively allow inmates to seek medical care, correctional facilities should have a supply of Medical Request Forms (i.e., Kites) readily available in housing units. SSDF 9.

At the Sacramento County Main Jail, kites are not readily available in the housing units. SSDF 12. Rather, they are distributed by pill call nurses who visit the inmate housing units twice in 24 hours. SSDF 12.  Accordingly, an inmate who wishes to request medical care must wait for the pill call nurse to arrive at the housing unit and request the form. SSDF 12. Kites are then picked up either by pill call nurses or by custodial staff. SSDF 12. Often, the inmate must wait for the *next* pill call nurse in order to submit the kite. SSDF 12.

Either way, the kites are not triaged by anyone at the time of collection, but are taken to the medical clinic at the end of the shift. SSDF 14. The Kites are then screened for emergencies by phlebotomists who are not registered nurses, not authorized to follow the Standardized Procedures, and not trained to recognize emergent medical needs, and who are therefore not qualified to do the initial triage or review. SSDF 15. After the initial triage, and if no urgent or emergent need is identified by the phlebotomist, the Kite information is entered verbatim into the CHS computer system, where supervisor nurses do a secondary review or triage. SSDF 15.

There ae no set times, guidelines or protocols for supervisor nurses to perform their triage of the electronic entries. SSDF 16. Moreover, since supervisor nurses work Monday through Friday but not over the weekend, Kites collected on a Friday might not be triaged until the following Monday or later. SSDF 16. Based on these policies and practices, unless the untrained and unqualified (for these purposes) phlebotomist finds the need for immediate health care, an inmate's health condition can go untreated for hours and/or days until a nurse supervisor finally reviews the Kite. SSDF 16.

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

January 6, 2012 was a Friday. SSDF 1. A Kite filled out by Scott that day, even if it had been collected, might not have been triaged until the following Monday. SSDF 16.

In addition to having a deficient system of distribution, collection and triaging, the format of the Kite can also lead to the failure to provide timely and proper medical care. SSDF 13. Specifically, the kite limits inmates to only list one medical issue or problem, thus discouraging the listing of multiple symptoms or complaints needed to assess a patient's medical condition. SSDF 13. In fact, inmates are directed to list only one condition or the Kite will be rejected. SSDF 13. In addition, the Kite does not list the time it was submitted or received, which is critical information needed to assess the urgency and to medically respond to the inmate. SSDF 13.

Kites at Sacramento County Main Jail instruct inmates as follows: "If your issue or problem is a medical emergency, contact custody." SSDF 13. The custody officer contacted then must act as the "middleman" between the inmate and Medical staff. SSDF 13.

The County's "Health Care Treatment Access" Operations Order policy directed as follows: "If an urgent or emergency prisoner health care need arises, custody staff shall immediately contact CHS [Correctional Health Services] and/or JPS [Jail Psychiatric Services] staff." SSDF 61. This same policy further directed: "Custody staff *shall not attempt to determine whether a prisoner needs health care*, and shall contact CHS medical staff to evaluate anyone who *may need immediate medical care*." SSDF 61 (emphasis added).

Under this policy, inmates cannot request treatment for a medical emergency directly from medical staff; rather, they must use a custody officer to act as the "middleman" between the inmate and medical staff. The custody officer "middleman" is both directed to determine whether a prisoner "may need immediate medical care," and prohibited from "attempt[ing] to "determine whether a prisoner need[ed] healthcare." SSDF 61. These two directives, one a prohibition and the other a mandate, are plainly inconsistent. It is not possible for a custody staff person to determine whether a prisoner may need immediate medical care without attempting to determine whether the prisoner needs healthcare.

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

31

1    Custody staff is not trained on recognizing emergent health care needs or on what to

2    do in order to secure medical care for an inmate. SSDF 7. The written policy regarding

3    healthcare for inmates is silent as to what a deputy is supposed to do if medical staff does

4    not provide care when requested. SSDF 7. The Sacramento County Main Jail's policy of

5    making a custody staff person the middleman between an inmate requesting emergent care

6    and medical staff directly prevents the proper screening of inmates' emergent medical needs

7    by removing all direct communication between the inmates claiming emergent medical

8    needs and the medical staff who must determine whether that care is needed. It also prevents

9    medical staff from being able to observe symptoms that could otherwise alert them to the

10   need for emergent medical care, or for closer monitoring or other steps.

11    There is sufficient evidence for a jury to find that the deficiencies in the County's

12   policy for inmate access to emergent medical treatment were so obvious, and the need to

13   remedy them likewise so obvious, that they were deliberately indifferent. *City of Canton*,

14   489 U.S. at 390; *Thompson v. Los Angeles*, 885 F.2d at 1444 (9th Cir. 1989) (plaintiff need

15   not prove the policymakers actually knew their omissions would likely result in

16   constitutional violations).

17   **B.  The County's policies were the moving force behind the violation.**

18    The County's omissions and failures in policy also caused the constitutional

19   violation. To constitute a "moving force" behind the violation, the identified deficiencies in

20   the County's policies must be "closely related to the ultimate injury." *City of Canton*, 489

21   U.S. at 391.

22    Here, there were two potential avenues for Mark Scott to have attempted to secure

23   emergent medical care on the day that he died: through custody staff and through a Kite.

24   Due to the County's omissions and inaction regarding its policies for inmate access to

25   emergent medical care, neither avenue was successful. Though Scott attempted to seek

26   emergent medical care through all available means, he did not receive it, resulting in his

27   death.

28

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

Deputy Tidwell informed Nurse Skerritt a single time, at approximately 1618 hours, that Scott "was vomiting." SUMF 4. Tidwell subsequently responded to further requests for emergent medical care by Scott and Vega (on Scott's behalf) that he "had spoken to the nurse and that Scott was not going to be seen," and that he had done "all that he could do. SSDF 38. In other words, Tidwell had fulfilled his duty as middleman under the policy by contacting CHS staff. In conduct that was deliberately indifferent, Tidwell subsequently ignored further pleas for emergent medical care by Scott and by Scott's cellmate on Scott's behalf. That the policy omissions and deficiencies were a moving force behind the constitutional violation is evidenced by Tidwell's statements to Vega and his subsequent statements to the entire housing pod that there was "nothing more he could have done" because he had "called Medical." SSDF 38.

Scott's attempt to secure emergent medical care using a Kite also clearly failed.  A medical Kite filled out by Scott, but uncollected by nurses, was found in his cell after his death. SUMF 26. Even if the kite had been collected by a nurse that day, it might not have been triaged until the following Monday or later. SSDF 16. Mark Scott is dead because both available options for obtaining emergent medical care, filling out a Kite and requesting emergency medical treatment from custody staff, failed him.  SSDF 20. Even the jail's supervising registered nurse Rey Rodriguez agrees that there was nothing else Scott could have done to obtain emergent medical care that day. SSDF 20.

### C.  The County can be held liable for a constitutional violation caused by its deficient policy even if no individual defendant is held liable in this case.

Defendants assert that the County of Sacramento cannot held liable for its deficient policies if Plaintiffs fail to establish a constitutional violation by one of the named individual defendants. ECF No. 65-1 at 33. Although circumstances exist under which such an argument is correct, both the Supreme Court and the Ninth Circuit have rejected the assertion that a municipal defendant is automatically absolved of liability if no individual defendant agent of that municipal defendant is held liable for violating any constitutional rights. *Gibson v. County of Washo*e, 290 F.3d at 1186 (citing collected cases).

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

33

1    In *Chew v. Gates*, for example, the Ninth Circuit held that the municipality may be
2    liable where an individual officer is exonerated on the basis of the defense of qualified
3    immunity because a constitutional violation might still have occurred. *Chew v. Gates*, 27
4    F.3d 1432, 1438-39 (9th Cir. 1994).  In *Owen v. City of Independence*, the Supreme Court
5    held that a public entity may be liable even if no liability is assigned to any single individual
6    officer. *Owen v. City of Independence*, 445 U.S. 622, 652 (1980). In *Fairley v. Luman*, the
7    Ninth Circuit explicitly rejected an entity's claim that it could not be held liable as a matter
8    of law because the jury had determined that the individual officers had inflicted no
9    constitutional injury.  *Fairley v. Luman*, 281 F.3d 913, 916 (9th Cir. 2002); *see also Hopkins*
10   *v. Andaya*, 958 F.2d 881 (9th Cir. 1992).

11   In this case, as in *Gibson v. County of Washoe*, the constitutional violations for
12   which the County is liable occurred before the actions of the individual defendants at the
13   jail, so the County is not being held liable for what those deputies did or did not do. *Gibson*
14   *v. County of Washoe*, 290 F.3d 1175, 1186. Accordingly, defendants' argument that the
15   County cannot be held liable for its policies if no individual defendant is held liable should
16   be rejected.

## VII. A JURY SHOULD DECIDE THE FAILURE TO SUMMON MEDICAL CARE STATE LAW CLAIM

19   In addition to the deliberate indifference to medical needs claims brought under the
20   Fourteenth Amendment of the United States Constitution, defendants Tidwell, Becker,
21   Pantoja, and Matranga as well as the County of Sacramento are each liable under an
22   analogous state law, statutorily based cause of action. Government Code section 845.6
23   provides that both a public entity and its employees may be liable for a failure to take
24   reasonable steps to summon emergent medical care for a prisoner in the entity's custody
25   when the employee is either actually or constructively aware of those needs.

26   As discussed at length both in plaintiffs' separate statement of disputing facts and
27   their response to the defendants' statement of undisputed facts, it is plaintiffs' contention
28   that an abundance of evidence affirmatively demonstrates both constructive and actual

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE
COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

knowledge of Scott's condition on the part of each deputy. The vomiting or coughing up of blood is both an obvious condition and one that is strongly indicative of a potentially serious condition.

"California courts have recognized that questions about jail personnel's actual or constructive knowledge of a prisoner's needs for immediate medical care as well as the reasonableness of actions taken to meet this need are factual questions most appropriately decided by a jury." *Estate of Abdollahi v. County of Sacramento*, 405 F. Supp. 2d 1194, 2015 (E.D. Cal. 2005) (citing *Zeitman v. County of Kern*, 168 Cal. 3d 1174, 1184 (1985) and *Johnson v. County of Los Angeles*, 143 Cal. AA 3d 298, 317 (1983). In *Abdollahi*, the evidence essentially consisted of circumstantial evidence of an inmate's suicidality based upon observations during cell checks at the main jail, while the evidence here concerns vomited blood, bleeding and explicit pleas for help.

The analysis in *Abdollahi* was favorably viewed and applied in *Lay v. Finander*, No. CV 11-04357 ODW (RZ), 2012 U.S. Dist. LEXIS 177665 (C.D. Cal. Nov. 6, 2012) and in *Kodimer v. County of San Diego*, No. 07-cv-2221-BEN (NLS), 2010 U.S. Dist. LEXIS 65090 (S.D. Cal. June 30, 2010). The *Kodimer* Court noted that summary judgment was inappropriate on these claims when there is a question of proximate causation. *Id.* at *30.

Defendants argue that a single cryptic call to Nurse Skerritt from Tidwell was all that was required to relieve the deputies from any potential liability and transform this into a straight medical malpractice action despite Skerritt's failure to render any care or assessment. Defendants have not cited nor can they cite any authority to support that position. California and Federal Courts have both recognized that the reasonableness of the actions to summon emergent medical care should be viewed by the trier of fact in light of all the changing circumstances and direct and circumstantial evidence. Accordingly, summary adjudication on this claim should be denied.

**CONCLUSION**

Plaintiffs have produced sufficient evidence from which a jury could find that: (1) Deputies Tidwell, Becker, Matranga and Pantoja were deliberately indifferent to Mr. Scott's

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

serious medical needs (first cause of action in the first amended complaint); (2) Defendants Brewer and Richael are liable on a supervisory theory of liability (fourth cause of action in the first amended complaint); (3) the County of Sacramento is liable based on the omissions and failures of its deliberately indifferent policies and practices regarding inmate access to emergent medical care (second and third causes of action in the first amended complaint); and (4) a jury could decide the failure to summon medical care state law claim (fifth cause of action, subsection (b) in the first amended complaint). Accordingly, Plaintiffs respectfully request the Court to deny the motion for partial summary adjudication as to these causes of action and defendants.

Plaintiffs do not oppose the motion as to the remaining causes of action and defendants.

Dated:  December 8, 2014                                    /s/ Stewart Katz_____
                                                          STEWART KATZ,
                                                          Attorney for Plaintiffs

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

36